IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA

Alexandria Division

CHERIE D. SMITH,                    )
                                    )
      Plaintiff,                    )
                                    )
          v.                        )      1:14cv565 (JCC/JFA)
                                    )
THE STRAYER UNIVERSITY              )
CORPORATION,                        )
                                    )
      Defendant.                    )

### M E M O R A N D U M   O P I N I O N

This action, brought under the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101 et seq., is before the Court on Defendant's Motion for Summary Judgment, filed pursuant to Rule 56 of the Federal Rules of Civil Procedure. [Dkt. 49.]  For the following reasons, the Court will grant the motion in part as to Counts Two, Three, and Four. Otherwise, the motion is denied as to Count One.

### I. Material Facts

The following material facts, as recited in Defendant's Statement of Facts [Dkt. 50-1] ("Def.'s Stmt.") and Plaintiff's Statement of Facts [Dkt. 60 at 3-14] ("Pl.'s Stmt."), are undisputed unless otherwise noted.[1]

---

[1] For citation purposes, the Court collectively refers to undisputed factual statements of both parties as "Stmt." with the corresponding paragraph.  For all exhibit numbers and page numbers, the Court uses the numbers as set forth by the parties, respectively, and not the pagination from CM/ECF.

In 2001, Defendant Strayer University Corporation ("Defendant"), a private university with a student body that consists primarily of working adults, hired Plaintiff Cherie D. Smith ("Plaintiff") as a part-time Academic Assistant at the Loudoun Campus location.  (Stmt. ¶¶ 1-2.)  In 2002, Plaintiff was promoted to the position of Learning Resource Center ("LRC") Manager/Coordinator ("LRCM").  (Id. at ¶ 2.)  On January 27, 2006, Plaintiff resigned.  (Id.)  In March of 2007, Plaintiff was rehired and worked for Defendant as LRCM until her termination on December 29, 2012.  (Id.)  This litigation primarily concerns events that occurred during Plaintiff's latter period of employment, mainly during 2011 and 2012.

As LRCM, Plaintiff was responsible for managing the LRC and supervising other LRC staff.  Essential functions of the LRCM position include: (1) ensuring the proper functioning of the LRC; (2) assisting students in using the LRC; (3) participating in student orientations; and (4) delivering presentations to students in targeted classes.  (Stmt. ¶ 5.)  Under Defendant's written policy, only LRCMs, Lab Monitors, LRC Assistants and Campus IT Specialists were authorized to open and staff the LRC.  (Def.'s Mem. in Supp. of Mot. for Summ. J. [Dkt. 50] ("Def.'s Mem.") Ex. 5.)  As of July 18, 2011, Defendant's campuses with one full-time LRCM and one part-time employee

operated the LRC from 2:00 p.m. to 10:00 p.m. Monday through
Thursday, 12:00 p.m. to 4:00 p.m. on Friday, and 9:00 a.m. to
1:00 p.m. on Saturday.  (Def.'s Mem. Exs. 5, 7.)  During the
time period relevant to this litigation, the Loudoun Campus LRC
staff was small and consisted of full-time LRCM Plaintiff, part-
time LRC Assistant Florence Poole, part-time Loudoun Campus IT
Support Specialist Maurice Paul, and part-time Computer Lab
Monitor Daniel Lim.[2]

        In January of 2012, Defendant hired Richard Corbi as
the Dean for the Loudoun Campus ("Dean Corbi") and he
immediately sought to improve the performance of the Loudoun
Campus in the face of several challenges.  (Stmt. ¶ 6.)  On one
front, Dean Corbi implemented staffing changes to the LRC.
First, in May of 2012, Dean Corbi reassigned Florence Poole from
her position as part-time LRC Assistant to a position as part-
time Academic Assistant.[3]  (Id. at ¶ 8.)  On October 15, 2012, IT
Support Specialist Maurice Paul was terminated.  (Id. at ¶ 10.)
Thus, as of October 15, 2012, the LRC staff consisted of
Plaintiff as the full-time LRCM and Daniel Lim as a part-time

---

[2] The Court construes the makeup of the LRC staff by reading the Amended
Complaint and the statements of fact, even though it was not explicitly
referenced by either party in the relevant papers now before the Court.  It
is also unclear based on the record before the Court whether the IT Support
Specialist was full-time or part-time, but the time records suggest part-time
work.  (Pl.'s Mem. in Opp'n to Mot. for Summ. J. ("Pl.'s Mem.") Ex. 25.)
[3] The reason for Poole's reassignment is disputed.  Defendant contends Poole
was reassigned to assist with an "academics backlog," while Plaintiff
contends Dean Corbi unilaterally and impermissibly reassigned Poole to "clean
his office" and to prevent his full-time Academic Assistant from resigning.

Computer Lab Monitor.[4]

The staffing of the LRC is relevant to the disposition of this motion because it meant that the Loudoun Campus LRC operated until 10:00 p.m. Monday through Thursday.

Plaintiff alleges that she had several disabilities that prevented her from working into the night, including a long-standing seizure disorder, anxiety disorder, bipolar disorder, and impaired vision at night due to cataracts, myopia, presbyopia, and/or photophobia. (Am. Compl. [Dkt. 15] ¶ 25.) Plaintiff contends that she informed Dean Corbi as early as the spring of 2012 that her disabilities prevented her from working night hours. (Pl.'s Stmt. ¶ 7.) However, based on the record now before the Court, this material fact remains disputed.

The material facts surrounding Plaintiff's work schedule are also in dispute. When Plaintiff was rehired in March of 2007, she originally worked as the LRCM Monday through Friday from 9:00 a.m. to 6:00 p.m. (Am. Compl. ¶ 24.) Defendant contends that Plaintiff knew by July of 2012 that Dean Corbi expected her to work during the evening hours. (Def.'s Stmt. ¶ 7.) By September of 2012, Defendant argues that Plaintiff agreed to work Monday nights when her husband did not

---

[4] Plaintiff contends that as of October 15, 2012, now Academic Assistant Florence Poole was available and qualified to "provide coverage in the LRC," but it remains undisputed that the LRC staff officially consisted of Plaintiff and part-time Computer Lab Monitor Daniel Lim after Florence Poole's reassignment and Maurice Paul's termination.

4

work so he could drive her home from work, and that she agreed
to begin working two or three nights per week once her husband
retired in November.[5]  (Id. at ¶ 9.)  Defendant further contends
that once IT Support Specialist Maurice Paul was terminated in
October of 2012, Plaintiff agreed to immediately start working
nights, and her husband stopped working in mid-October to
accommodate this schedule change but officially retired on
November 1, 2012.  (Id. at ¶¶ 10-12.)

Conversely, Plaintiff asserts that by September of
2012, Dean Corbi "made" her work Monday nights with full
knowledge and in disregard of her disabilities.  (Pl.'s Stmt. ¶
9.)  Plaintiff further contends the she acquiesced and
"reluctantly said yes" to the new night schedule after an
intimidating meeting with Dean Corbi out of fear of losing her
job.  (Id. at ¶ 11.)

It is undisputed, however, that between November 5,
2012 and December 29, 2012, Plaintiff worked from 1:00 p.m. to
10:00 p.m. Monday through Wednesday, did not work on Thursday
and Friday, and worked from 9:00 a.m. to 5:00 p.m. on Saturday.
(Stmt. ¶ 13.)

---

[5] Plaintiff and her husband shared one car, and she depended on him to drive
at night due to her vision disabilities.  Before her husband retired,
Plaintiff had commuted into work early in the morning with her husband, and
would sleep at a friend's house before her Strayer shift.  In the afternoons,
Plaintiff's husband would wait at Florence Poole's house, or the Loudoun
Campus, to drive Plaintiff home once her shift ended.  (Stmt. ¶¶ 15, 16.)

While Plaintiff received some "corrective action forms" in 2003 during her initial period of employment with Defendant, she also received praise from students in 2009 and 2010, and positive performance reviews from other supervisors or regional managers in 2010, 2011, and 2012. (Stmt. ¶ 3.)  On August 1, 2012, however, Dean Corbi prepared a Mid-Year Evaluation for Plaintiff and rated her performance as 2.03 on a 1-5 scale, five being the best, which meant "improvement [was] required."  (Id. at ¶ 18.)

On November 6, 2012, Dean Corbi placed Plaintiff on a Performance Improvement Plan ("PIP") that was to expire approximately thirty (30) days later on December 12, 2012. (Stmt. ¶ 21.)  The PIP counseled Plaintiff regarding her unsatisfactory classroom presentations, poor customer service, failure to communicate in a positive manner, and failure to accurately record her time.[6]  (Id.)  Throughout the PIP period, Plaintiff feared she would lose her job and was aware that Dean Corbi continued to consider her performance unsatisfactory and noted no improvement, even though she worked "diligently" toward completing the PIP objectives and improving her performance. (Id. at ¶¶ 22-24.)

On December 4, 2012, almost one month after the PIP

---

[6] Plaintiff disputes the accuracy and validity of the PIP.  (Pl.'s Stmt. ¶ 21.)

was initiated and eight days before it was due to expire, Plaintiff submitted a request to Dean Corbi that she be allowed to work a "day shift," without proposing specific hours.  (Stmt. ¶ 26.)  On December 18, 2012, after providing Plaintiff the necessary ADA forms, Defendant received a formal "Request for Accommodation" that clarified the original request.[7]  (Id. at ¶¶ 27-28.)  On December 20, 2012, Defendant denied Plaintiff's Request for Accommodation, a decision that did not involve Dean Corbi.  (Id. at ¶ 29.)  After a final progress check on December 29, 2012, Defendant was terminated for poor performance.[8]  (Id. at ¶ 25.)

On June 18, 2013, Plaintiff initially filed a Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC") alleging Defendant discriminated and retaliated against her because of her disabilities from November of 2009 until December of 2012.  (Def.'s Mem. Ex. 12.)  She requested that the Charge of Discrimination be filed with both the EEOC and the state or local agency.  (Id.)  On March 26, 2014, the EEOC issued Plaintiff a "Right to Sue" letter.  (Am.

---

[7] Defendant's specific response to Plaintiff's initial December 4th request is disputed.  Defendant contends that it took immediate action, sending her ADA forms, evaluating whether it could staff the LRC consistent with her request, and contacting her to inquire about whether she wanted to apply for FMLA leave.  (Def.'s Stmt. ¶ 27.)  Plaintiff contends that although Defendant sent her the ADA forms, it did not take identifiable actions to "evaluate" Plaintiff's request pursuant to her medical documentation, or to consider possible accommodations or alternatives.  (Pl.'s Stmt. ¶ 27.)
[8] Naturally, Plaintiff also disputes that she was terminated for legitimate performance reasons.  (Pl.'s Stmt. ¶ 25.)

Compl. ¶ 17.)  On May 15, 2014, Plaintiff filed her original complaint under the ADA initiating this matter.  [Dkt. 1.]  On August 26, 2014, by agreement of the parties and with leave of Court, Plaintiff filed an Amended Complaint.  [Dkt. 15.]

In the Amended Complaint, Plaintiff asserts four counts against Defendant under the ADA: (1) failure to accommodate her disability (Am. Compl. ¶¶ 107-119); (2) discrimination by harassment and creating a hostile work environment during her employment (id. at ¶¶ 120-128); (3) discrimination in the termination of her employment (id. at ¶¶ 129-137); and (4) retaliation for engaging in protected activity (id. at ¶¶ 138-146).  The matter is now before the Court on Defendant's Motion for Summary Judgment.

## II. Standard of Review

Summary judgment is appropriate only if the record shows that "there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c); see also Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986); Evans v. Techs. Applications & Serv., Co., 80 F.3d 954, 958-59 (4th Cir. 1996) (citations omitted).  In reviewing the record on summary judgment, "the court must draw any inferences in the light most favorable to the non-movant [and] determine whether the record

taken as a whole could lead a reasonable trier of fact to find for the non-movant."  Brock v. Entre Computer Ctrs., 933 F.2d 1253, 1259 (4th Cir. 1991) (citations omitted).

Once a motion for summary judgment is properly made and supported, the opposing party has the burden of showing that a genuine dispute exists.  See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586-87 (1986); see also Ray Commc'ns, Inc. v. Clear Channel Commc'ns, Inc., 673 F.3d 294, 299 (4th Cir. 2012) (stating the opposing party must "come forward with specific facts showing that there is a genuine issue for trial.") (citations and internal quotations omitted).

### III. Analysis

Defendant moves for summary judgment and argues it is entitled to judgment as a matter of law as to each of the four counts in Plaintiff's Amended Complaint.  For the following reasons, the motion is granted in part and denied in part.

#### A. Statute of Limitations Period

As a threshold matter, Defendant contends the 180-day statute of limitations period applies, not the 300-day limitations period, because Plaintiff filed her initial charge of discrimination with the EEOC and not with a state or local agency.  (Def.'s Mem. at 4.)  Thus, Defendant argues the Court can only consider acts that allegedly occurred on or subsequent

to December 20, 2012, which is 180-days prior to the date she filed the charge of discrimination with the EEOC.  (Id.) Plaintiff maintains the 300-day statute of limitations period is appropriate.  The Court agrees.

Virginia is a "deferral state" under Title VII and the ADA, and thus, the limitation period for filing a charge with the EEOC is 300 days from the date of discrimination.  Tinsley v. First Union Nat'l Bank, 155 F.3d 435, 440 (4th Cir. 1998), overruled on other grounds by Nat'l R.R. Passenger Corp. v. Morgan, 536 U.S. 101 (2002); see also Johnson v. Portfolio Recovery Assocs., LLC, 682 F. Supp. 2d 560, 584 (E.D. Va. 2009) ("Virginia has its own enforcement agency; therefore, the charge must be filed within 300 days after the alleged unlawful employment practice occurred.") (internal quotation marks and citations omitted).  Plaintiff filed her charge with the EEOC on June 18, 2013, wherein she requested that it also be filed with the state or local agency.  (Def.'s Mem. Ex. 12.)

Accordingly, the Court will not consider discrete acts of discrimination that allegedly occurred before August 22, 2012, more than 300 days before Plaintiff filed the charge of discrimination.  Nat'l R.R. Passenger Corp., 536 U.S. at 105 ("We hold that the statute precludes recovery for discrete acts of discrimination or retaliation that occur outside the

statutory period."). Conversely, any allegations of hostile work environment are not precluded by the 300-day limitations period, and they may be properly considered by the Court. Id. at 122 ("A charge alleging a hostile work environment claim, however, will not be time barred so long as all acts which constitute the claim are part of the same unlawful employment practice and at least one act falls within the time period.").

### B. Claims under the ADA

In the employment discrimination context, including under the ADA, to avoid summary judgment in defendant's favor, a plaintiff must either produce direct or circumstantial evidence of defendant's discriminatory motivations, or proceed under the two-step "pretext" framework set forth in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973). See Hill v. Lockheed Martin Logistics Mgmt., Inc., 354 F.3d 277, 284-85 (4th Cir. 2004); see also Ennis v. Nat'l Assoc. of Bus. & Educational Radio, Inc., 53 F.3d 55, 58 (4th Cir. 1995) ("[T]he McDonnell Douglas scheme of proof does apply to appropriate claims under the ADA."). Finding no direct or circumstantial evidence of discrimination in the record, the Court applies the familiar McDonnell Douglas burden-shifting framework.[9] Ennis, 53 F.3d at 57-58.

---

[9] The Court notes that neither party states whether the McDougall-Douglas framework applies. Without direct or circumstantial evidence of discrimination, however, this analysis is appropriate.

Under the McDonnell Douglas proof scheme, the plaintiff has the initial burden of proving a prima facie case of discrimination by a preponderance of the evidence. If the plaintiff succeeds in proving the prima facie case, the burden shifts to the defendant to articulate some legitimate, nondiscriminatory explanation which, if believed by the trier of fact, would support a finding that unlawful discrimination was not the cause of the employment action. If the defendant meets this burden of production, the presumption created by the prima facie case "drops out of the picture," and the plaintiff bears the ultimate burden of proving that she has been the victim of intentional discrimination.

Id. at 58 (citing St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 113 S. Ct. 2742, 2746-49 (1993) (holding that prima facie case plus disbelief of employer's asserted justification for employment action is not necessarily sufficient to establish violation; summary judgment is appropriate unless plaintiff presents adequate evidence that employer unlawfully discriminated)).  With this standard in mind, the Court now considers each of Plaintiff's four counts in the Amended Complaint.

1. Failure to Accommodate Disability (Count One)

To establish a prima facie case of failure to accommodate a disability under the ADA, Plaintiff must establish: (1) she was an individual who had a disability within the meaning of the statute; (2) Defendant had notice of her

disability; (3) with reasonable accommodation she could perform the essential functions of the position; and (4) Defendant refused to make such accommodations.  Wilson v. Dollar General Corp., 717 F.3d 337, 345 (4th Cir. 2013) (quoting Rhoads v. Fed. Deposit Ins. Corp., 257 F.3d 373, 387 n.11 (4th Cir. 2001) (quoting Mitchell v. Washingtonville Cent. Sch. Dist., 190 F.3d 1, 6 (2d Cir. 1999))).

At issue is Defendant's denial of Plaintiff's Request for Accommodation, initially submitted to Dean Corbi on December 4, 2012, formally filed with Defendant on December 18, 2012, and denied by Defendant without Dean Corbi's involvement on December 20, 2012.[10]  When asked to describe the accommodation needed, Plaintiff stated: "[I n]eed to have my day shift back to allow me more rest/sleep.  I had no problems when I was on day shift." (Pl.'s Ex. 61 at 1.)  In furtherance of this request, Plaintiff stated: "[I h]aven't had a seizure for 30 years then [I had] one after my schedule was changed to nights[,] which caused lack of sleep and increased anxiety."  (Id.)

---

[10] There are two separate emails in the record that could also be construed as requests for an accommodation.  In November of 2009, Plaintiff emailed then-Dean O. Iwuanyanwu to inquire about a schedule change during the fall and winter to avoid driving in the dark.  (Def.'s Mem. Ex. 59.)  Then, in February of 2009, there was an email exchange between Plaintiff and an Employee Relations Specialist regarding her use of a "livescribe-pulse smartpen" to assist Plaintiff in taking notes.  (Def.'s Mem. Ex. 58.)  Both discrete acts occurred well before August 22, 2012, and therefore, are not properly before the Court for consideration.  The Court considers Plaintiff's request to "have [her] day shift back" as the only accommodation request and denial before the Court.

Plaintiff's treating physician, Dr. Kevin Weaver, diagnosed Plaintiff with "seizure disorder" and "anxiety disorder."  (Id. at 2.)  As a result, Dr. Weaver opined that Plaintiff was "unable to drive for at least 6 months due to [a] recent seizure[,] requires at least 7-8 hours of sleep [each] night[ because] insufficient sleep increases seizures[, and] . . . stressors which increase her anxiety disorder."  (Id. at 3.) Dr. Weaver's suggested an accommodation as follows:

> Allow patient to work a normal day shift. She cannot drive, must ride with her husband who works a day shift.  If she works into the evening she gets home late, but still must get up early in the morning to ride with [her] husband.  This insufficient sleep contributes to her seizures.  Also, not being home to help care for her daughter who has mental health issues triggers her anxiety disorder.

(Id.)  On December 20, 2012, Defendant denied Plaintiff's request because it interfered with the essential functions of the LRCM position and if granted, would impose an undue hardship on Defendant's operations.  (Def.'s Ex. 60.)

It is undisputed that Defendant had notice of Plaintiff's seizure disorder and anxiety disorder, and that it refused to provide any accommodation, leaving elements two and four satisfied.  Defendant contends it is entitled to judgment as a matter of law on Count One because Plaintiff has failed to establish she was a qualified individual with a disability who

14

could perform the essential functions of the position with
reasonable accommodation.  Because genuine issues of material
fact exist as to whether Plaintiff was a "qualified individual,"
i.e., whether she could perform the essential functions of the
LRCM position, judgment as a matter of law is inappropriate.

It is undisputed from the record now before the Court
that Plaintiff is an individual with a disability as defined
under the ADA.  "Seizures[11] are a physical or mental impairment
that substantially limits one or more [major life activities of
an individual]."  Martinson v. Kinney Shoe Corp., 104 F.3d 683,
686 (4th Cir. 1997) (quoting 42 U.S.C. § 12102(2)(A) (defining
disability)).  It is also uncontested that Plaintiff suffers
from a seizure disorder, and experienced a grand mal seizure on
November 30, 2012.  (Pl.'s Mem. Ex. 31, Weaver Dep. at 125-26.)
Thus, Plaintiff establishes the first element, that she is an
individual with a disability within the meaning of the statute.
(See Pl.'s Mem. Ex. 46, Strayer's Response to EEOC Charge of
Discrimination at 10 ("Strayer does not dispute that Ms. Smith
is disabled.").)

It is greatly disputed, however, whether Plaintiff was
a "qualified individual" who could perform the essential
functions of the LRCM position with, or without, reasonable

---

[11] Plaintiff sought an accommodation for her seizure disorder and her anxiety
disorder, not for any vision difficulties. (Def.'s Ex. 61.)  Thus, the Court
will not address the parties' belabored arguments as to this issue.

accommodation, the third element of the prima facie case for failure to accommodate under the ADA.

The ADA plainly recognizes that a "reasonable accommodation" may include "job restructuring" and "part-time or modified work schedules."  42 U.S.C. § 12111(9)(B).  But given the contested record now before the Court, and when viewing that evidence in a light most favorable to the non-moving Plaintiff, the Court finds a genuine issue of material fact exists as to whether working evening or night hours is an essential function of the LRCM position.  This factual dispute must be resolved by the finder of fact and not by the Court on summary judgment. See Hill v. Harper, 6 F. Supp. 2d 540, 544 (E.D. Va. 1998) (finding the "essential function" and "reasonable accommodation" inquiries to be fact specific).

Defendant contends the record is undisputed on this issue, that working between 6:00 p.m. and 10:00 p.m. is an essential function of the LRCM position.  In support, Defendant references two Policy Memoranda that set new operating hours for LRCs University-wide effective July 18, 2011.  (Def.'s Mem. Exs. 5, 7.)  But the Memoranda are silent as to who must staff the LRC at what time and they certainly do not explicitly require the LRCM to work into the evening hours.  (Id.)  Defendant also argues that because Plaintiff knew her essential functions

16

involved assisting students in the LRC and delivering
presentations to targeted classes, some of which were held in
the evening, then Plaintiff was also aware that working evening
hours was required as an essential function of the job.  (Def.'s
Mem. Ex. 1, C. Smith Dep. at 110-112.)  But the LRCM Job
Description itself is also silent as to whether working nights
is an essential function of the job (see Def.'s Mem. Ex. 8), and
on summary judgment, the Court "must draw any inferences in the
light most favorable to the non-movant[.]"  Brock, 933 F.2d at
1259.

          Moreover, the list of an LRCM's essential duties and
functions is over two pages long and discusses the LRCM's
responsibilities in the library, for student career development,
and with testing and Information Technology support.  (Id. at 1-
3.)  Yet, it is silent as to the requisite working hours, and it
remains disputed whether working during night hours is an
essential function of the LRCM position.  Even if, in Dean
Corbi's judgment, it were essential for the LRCM to work night
hours, this judgment conflicts with Defendant's own written
description of the job, such that it cannot be resolved by the
Court as a matter of law.  See 42 U.S.C. § 12111(8)
("[C]onsideration shall be given to the employer's judgment as
to what functions of a job are essential, and if an employer has

prepared a written description . . . this description shall be considered evidence of the essential functions of the job.").[12]

Thus, a genuine issue of material fact remains as to the essential functions of the LRCM position, and once established, whether Plaintiff could perform those functions with or without reasonable accommodation.  The Court need not reach Defendant's additional arguments regarding the reasonableness of the request and whether the request constituted an undue hardship, because the threshold definition of "essential function" is in dispute.  Cf. Solomon v. Vilsack, 763 F.3d 1, 10 (D.C. Cir. 2014) (finding "physical presence at or by a specific time is not, as a matter of law, an essential function of employment.") (emphasis in original) (quoting McMillan v. City of New York, 711 F.3d 120, 126 (2d Cir. 2013)) (citing Ward v. Mass. Health Research Inst., Inc., 209 F.3d 29, 34-35 (1st Cir. 2000)).  Because such factual disputes remain, Defendant is not entitled to judgment as a matter of law for failure to accommodate and the Motion for Summary Judgment is denied as to Count One.[13]

---

[12] The undisputed fact that Plaintiff's successor at the Loudoun LRC works four nights a week does nothing to change the outcome.  (Stmt. ¶¶ 13, 14.) The relevant consideration for the Court includes the Job Description prepared "before advertising or interviewing applicants for the job," and it is unclear whether the Job Description has changed.  42 U.S.C. § 12111(8).
[13] The Court also notes that based on the record, it appears Defendant failed to engage in an "interactive process" with Plaintiff after she filed her request for accommodation, as required by 29 C.F.R. § 1630.2(o)(3).  See Wilson v. Dollar General Corp., 717 F.3d 337, 346-47 (4th Cir. 2013).

## 2. Harassment and Hostile Work Environment (Count Two)

To establish a prima facie case of harassment and hostile work environment, Plaintiff must establish: (1) she was a qualified individual with a disability; (2) she was subjected to unwelcome harassment; (3) the harassment was based on her disability; (4) the harassment was sufficiently severe or pervasive to alter a term, condition, or privilege of employment; and (5) some factual basis exists to impute liability for the harassment to the employer.  Rohan v. Networks Presentations LLC, 375 F.3d 266, 272 n.9 (4th Cir. 2004); see also Wells v. BAE Sys. Norfolk Ship Repair, 483 F. Supp. 2d 497, 511-12 (E.D. Va. 2007).

In short, Defendant is entitled to judgment as a matter of law on Count Two because there is no evidence in the record to support a claim that Plaintiff was subjected to objectively severe or pervasive harassment because of her disability.  Even assuming the other elements of the prima facie case are satisfied, Plaintiff fails to set forth any evidence of objectively pervasive harassment, and thus, even when viewing the evidence in a light most favorable to her, no rational finder of fact could find in her favor on Count Two.  Brock, 933 F.2d at 1259.

For Plaintiff to avert summary judgment on this claim

there must be some dispute in the record over harassment
Plaintiff endured during her employment with Defendant.  The
Court finds no dispute at all.  To prevail, Plaintiff must
establish the work environment was subjectively and objectively
hostile.  Fox v. General Motors Corp., 247 F.3d 169, 178 (4th
Cir. 2001) (citation omitted).  The Court must look at the
frequency and severity of the discriminatory conduct, whether it
unreasonably interfered with Plaintiff's work performance, and
whether it was physically threatening or humiliating, or just
offensive utterances.  Id.  The evidence in the record is
undisputed that Plaintiff did not endure any objectively hostile
harassment.

Plaintiff claims that the following acts by Defendant
constitute pervasive and severe harassment that created a
hostile work environment: the reassignment of Florence Poole
from the LRC to the Academic department; changing Plaintiff's
work schedule to include evening shifts; placing Plaintiff on
the PIP; and denying Plaintiff's request for accommodation.  On
their face, these employment actions cannot be construed as
objectively hostile.

In Fox, the employee's supervisors "constantly berated
him and harassed him and the other disabled workers; indeed, Fox
presented evidence that such harassment occurred at least

weekly." Id. at 179.  The supervisors encouraged other
employees to join in on the harassment, and they also exposed
the employee to physical harm.  Id.  (emphasis added).  Thus,
the Fourth Circuit affirmed the jury's verdict in the employee's
favor on the hostile work environment claim.  Id.  But the ADA
is not a "general civility code" that governs workplace
behavior.  Rozier-Thompson v. Burlington Coat Factory Warehouse
of Pocono Crossing, Inc., No. 3:05CV456-JRS, 2006 WL 1889651, at
*6 (E.D. Va. July 7, 2006) (citing Cannice v. Norwest Bank Iowa
N.A., 189 F.3d 723, 726 (8th Cir. 1999) (quoting Oncale v.
Sundowner Offshore Servs., Inc., 523 U.S. 75, 80 (1998)).  In
Rozier-Thompson, the Court granted summary judgment in the
employer's favor on the hostile work environment claim because
three alleged disability-based comments over the period of
almost three years, which included calling the employee a
"cripple," "old and infirm," and "old and disabled and no good
to the company," were not legally sufficient to constitute an
objectively hostile work environment claim.  Id. at *7.

     So too here, there is nothing in the record, not even
infrequent or occasional harassment that rises to the level
necessary to constitute an objectively hostile work environment.
Simply put, there is no objective harassment in the record now
before the Court.  Employment decisions made by Defendant,

discussed above, do not form the basis for a hostile work environment claim, let alone provide undisputed evidence of such a claim, when there is no evidence to establish that such actions were _objectively_ hostile.  _Fox_, 247 F.3d at 178.  A reasonable finder of fact could not find otherwise. Accordingly, because there is no genuine issue of material fact as to Plaintiff's hostile work environment claim, the Motion for Summary Judgment will be granted as to Count Two.

### 3. Wrongful Termination of Employment (Count Three)

To establish a _prima facie_ case of discrimination by termination of employment, Plaintiff must show she: (1) was disabled or within ADA's protected class; (2) was discharged by Defendant; (3) performed the job at a level that met Defendant's legitimate expectations at the time of her discharge; and (4) the discharge occurred under circumstances that raise a reasonable inference of unlawful discrimination.  _Haulbrook v. Michelin N. Am._, 252 F.3d 696, 702 (4th Cir. 2001); _Pruitt v. Fairfax Cnty. Sch. Bd._, No. 1:12-cv-1390, 2013 WL 4101252, at *5 (E.D. Va. Aug. 13, 2013).

Even if the Court assumes Plaintiff has met her burden as to elements one,[14] two, and four, Plaintiff's claim fails to

---

[14] Notably, Count Three in the Amended Complaint alleges Plaintiff was terminated because of her "impaired vision at night or in dim light," and not because of her seizure disorder.  (Am. Compl. ¶ 131.)  The Court need not address the issue of whether Plaintiff was disabled or within ADA's protected class, however, because even if the Court assumes this element has been

establish a prima facie case as a matter of law because it is undisputed that Plaintiff was not, at the time of her termination, meeting Defendant's legitimate expectations.

Defendant identifies a litany of reasons Plaintiff was terminated for poor performance.  In August of 2012, on the Mid-Year Performance Rating, Plaintiff received a 2.03 out of 5, equating to "improvement needed."  (Def.'s Mem. Ex. 24.)  In October of 2012, Plaintiff was unable to make necessary classroom presentations, and on at least one occasion, asked a professor for assistance in showing a student the correct APA citation format.  (Id. Exs. 28, 29.)  Shortly thereafter, on November 6, 2012, Plaintiff was placed on a 30-day PIP, which specifically identified performance deficiencies that needed improvement.  (Id. Ex. 30 ("Poor customer service/Failure to assist students or conduct activities to foster information literacy . . . failure to communicate and manage in a positive manner . . . failure to follow University procedures regarding Payroll (Timesaver) system . . . ."); see also Ex. 31.)

But Plaintiff's performance did not improve; in fact, it is undisputed that her performance worsened.  Most notably, on November 8, 2012, Plaintiff gave herself an overall rating of 2.84 out of 5 on the annual performance review, which is

---

satisfied, Plaintiff's claim for wrongful termination still must fail as a matter of law.

considered "below effective" but above "improvement needed."
(Def.'s Mem. Ex. 34.)  Weeks later, Plaintiff sought assistance
in updating her resume because she knew she needed "to find
another job quickly."  (Id. Ex. 39 ("I don't think I am going to
be here much more than Dec 12, 2012.  My boss just had another
meeting with me about my performance improvement plan and he
said there was no change.  I am on the second step.").)  Indeed,
by the interim performance check with Dean Corbi, Plaintiff was
still failing to follow payroll procedures, and had made no
additional classroom presentations.  (Id. Exs. 40, 41.)  By the
final progress check, Plaintiff's performance had worsened, and
Dean Corbi raised at least six new concerns.  (Id. Exs. 47, 48
(including missing meetings, failing to post LRC hours, failing
to properly assist students).)

        Plaintiff attempts to create a genuine issue of
material fact as to her performance by contesting the validity[15]
of the PIP, claiming it was unreasonable and retaliatory.
(Pl.'s Mem. at 30-32.)  Plaintiff also claims the PIP faulted
her for symptoms of her disabilities.  (Id.)  But Plaintiff
cannot point to any evidence in the record that shows she was
meeting Defendant's legitimate expectations at the time of her

---

[15] Plaintiff contends her PIP was much shorter than typical PIPs, and argues
that this tends to show her PIP was retaliatory and merely a pretext.  (Pl.'s
Mem. Ex. 53.)  This does nothing, however, to call into question Plaintiff's
actual work performance.

termination.  Plaintiff's "own naked opinion [about the validity of the PIP], without more, is not enough to establish a prima facie case of . . . discrimination."  Goldberg v. B. Green and Co., Inc., 836 F.2d 845, 848 (4th Cir. 1988).  Plaintiff contends that she was meeting Defendant's legitimate expectations because Defendant received no complaints from students.  (Pl.'s Mem. Ex. 10 at 4 ("Strayer is not currently aware of any complaint made to the University by a Strayer student about Cherie Smith or her performance.").)  Plaintiff omits the remainder of this discovery response, however, which goes on to enumerate Plaintiff's unprofessional behavior in front of students.  (Id.)  On summary judgment, the Court is not required to accept conclusory assertions regarding Plaintiff's own state of mind, motivations, or perceptions regarding the employment actions at issue.  Goldberg, 836 F.2d at 848 (citing Zoby v. American Fidelity Co., 242 F.2d 76, 80 (4th Cir. 1957)).  Indeed on summary judgment, the Court cannot find that a genuine issue of material fact exists based solely on "mere speculation or the building of one inference upon another[.]"  Othentec Ltd. V. Phelan, 526 F.3d 135, 140 (4th Cir. 2008).  Accordingly, because Plaintiff's speculation as to Defendant's implementation and validity of the PIP cannot suffice to create a genuine issue of material fact, and because Plaintiff has otherwise not

produced affirmative evidence showing that a genuine issue exists as to her performance at the time of termination, Plaintiff fails to establish a prima facie case of wrongful termination, and judgment will be entered in Defendant's favor on this claim.

Alternatively, even if the Court assumed Plaintiff could establish a prima facie case of wrongful termination, Defendant has met its burden of production by articulating a legitimate, non-discriminatory reason for her termination: poor performance. Texas Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248, 253 (1981). At this juncture, Plaintiff also fails to satisfy the specific requirement that she proves "poor performance" was really not the true reason for her termination, but just a pretext for discriminating against her because of her disability. Id. "In reviewing whether an employer's decision is unlawful, the Court's task is not 'to decide whether the reason for termination of employment was wise, fair, or even correct, ultimately, so long as it truly was the reason for the decision.'" Mercer v. Arc of Prince George's Cnty., Inc., 532 F. App'x 392, 399 (4th Cir. July 11, 2013) (quoting Laing v. Fed. Exp. Corp., 703 F.3d 713, 722 (4th Cir. 2013)). There is nothing in the record to support the notion that Plaintiff was actually terminated because of her disability. Instead, the

undisputed record shows Defendant's true reason for terminating Plaintiff was because of consistently poor performance.

For these reasons, Defendant is entitled to judgment as a matter of law on Plaintiff's wrongful termination claim, and the Motion for Summary Judgment will be granted as to Count Three.

### 4. Retaliation (Count Four)

To establish a prima facie case of retaliation, Plaintiff must prove: (1) she engaged in protected activity under the ADA; (2) Defendant acted adversely against her; and (3) the protected activity was casually connected to employer's adverse action.  Rhoads v. FDIC, 257 F.3d 373, 392 (4th Cir. 2001).  Plaintiff claims that after requesting an accommodation, which is protected activity under the ADA, Defendant retaliated after it refused to engage in an interactive process, denied her request without actually considering it, and eventually terminated her employment.  (Am. Compl. ¶ 140.)  Defendant is entitled to judgment as a matter of law on this claim as well, because it is undisputed that Plaintiff's termination was not causally connected to her request for accommodation.

The evidence in the record now before the Court shows that Plaintiff knew she was going to lose her job because of poor performance, and not because of her request for a

disability accommodation.  Plaintiff's formal request came over one month after the PIP had started and almost a week after the PIP was originally scheduled to conclude.

On November 6, 2012, Plaintiff was placed on the PIP. By November 21, 2012, Plaintiff knew her job was in jeopardy, and even took steps "to find another job quickly," because she didn't think she was "going to be here much more than Dec 12, 2012." (Def.'s Mem. Ex. 39.)  Almost a week later, and close to one month after she was placed on the PIP, only then did Plaintiff submit an informal request for accommodation to Dean Corbi, followed by a formal request for accommodation two weeks later on December 18, 2012 with medical documentation.  The request was denied on December 20, 2012, and Plaintiff was terminated on December 29, 2012, close to two months after she was placed on the PIP and only eleven days after filing a formal request for accommodation.

Temporal proximity between protected activity and the adverse employment action can be "highly suspicious" and "give[] rise to a strong inference of . . . discrimination."  Weth v. O'Leary, 796 F. Supp. 2d 766, 782 (E.D. Va. 2011).  But temporal proximity alone is insufficient to establish the third element of causation.  Staley v. Gruenberg, 575 F. App'x 153, 156 (4th Cir. Jun. 6, 2014) (citing Hernandez v. Yellow Transp., Inc.,

670 F.3d 644, 660 (5th Cir. 2012) (holding that "but for causation . . . cannot be established by temporal proximity alone"), cert. denied, --- U.S. ---, 133 S. Ct. 136 (2012). The facts here are undisputed. Plaintiff knew for over a month before she filed her formal request for accommodation that her job was in jeopardy. Her performance did not improve during this period of time. She even considered herself an ineffective employee. Based on these undisputed facts, Plaintiff cannot establish the causal connection necessary between her request for accommodation and her termination. If anything, the temporal proximity in this case suggests to the Court that Plaintiff was desperately attempting to save her job with Defendant in any way she could.

Accordingly, judgment as a matter of law will be entered in Defendant's favor on Plaintiff's retaliation claim, and the Motion for Summary Judgment is granted as to Count Four.

## IV. Conclusion

For the foregoing reasons, the Court will grant Defendant's motion for summary judgment in part as to Plaintiff's hostile work environment, wrongful termination, and retaliation claims, and enter judgment in Defendant's favor as to counts two, three, and four. Otherwise, the motion for summary judgment is denied as to count one, failure to

accommodate.

An appropriate Order will issue.


_____/s/_____
January 13, 2015                James C. Cacheris
Alexandria, Virginia     UNITED STATES DISTRICT COURT JUDGE